Filed 2/8/22  P. v. Clark CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C076713 |
| Plaintiff and Respondent, | (Super. Ct. No. CM039031) |
| v. | |
| DONALD GEORGE CLARK, | |
| Defendant and Appellant. | |

A jury found defendant Donald George Clark guilty of three counts of murder and one count of arson.  He was sentenced to, inter alia, two terms of life without the possibility of parole.  On appeal, defendant contends the trial court erred in admitting his confessions because (1) his initial confession was obtained without *Miranda*[1] warnings,

---

[1]  *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

and (2) his subsequent post-*Miranda* statements were obtained after the ineffective *Miranda* advisements.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

At the time of the murder, defendant was 72 years old and lived alone as a caretaker of large property outside of Chico. The victims were two young men, 17-year-old R.J., 15-year-old R.L., and a 46-year-old woman, C.L., who was the mother of R.L. Defendant was familiar with R.J., but did not know the others. A week after the murder, defendant spoke with detectives and eventually admitted shooting the three victims in self-defense.[2]

### The Murders

As defendant told investigating detectives, R.J. had previously stolen property from him and a neighbor. On the day of the shooting, the three victims drove to his property asking for gas, and R.J. "started giving me a bunch of shit." Defendant told R.J., "he wasn't wanted here," and to, "get off." R.J. replied, "You can't kick me off . . . you're not the caretaker, I am." Defendant asked, "Who gave you permission?"

When R.J. didn't respond, defendant got his shotgun to scare them off the property. But R.J. continued to mouth off as defendant told him to leave. Then — as defendant explained to the detectives — while he was holding the gun, "[R.J.] took a big step and grabbed the gun, and I, I pulled it out, and I, I went like this and it went off. And then, the other guy, picked up the BB gun and was, like he was going to use it as a club and he was going to hit me." He said the girl came at him with a knife, so he shot her.[3]

---

[2] At trial, a recording of the interviews were played for the jury.

[3] The prosecutor argued at closing: "My suggestion to you is [the 15-year-old victim] and his mom, having just seen [the 17-year-old victim] murdered right in front of them,

2

Defendant then stripped their clothing and put them in their car, along with his bike. He then drove a ways away, doused the bodies with gasoline, and set the car on fire.[4] He then rode his bike back home. He later threw the victims' clothing in dumpsters and put the shotgun and shells in his storage unit. He also scraped up the dirt where blood had been shed and put the soiled dirt in his storage unit.

## Verdict and Sentencing

The jury returned guilty verdicts for two counts of first degree murder, with firearm enhancements for the killing of the 15-year-old victim and his mother. For R.J., the jury found defendant guilty of second degree murder, but found the firearm enhancement as to that victim not true. It also found defendant guilty of arson of property and found a multiple-murder special-circumstance allegation true.

The trial court sentenced defendant to two terms of life without the possibility of parole for the first degree murder convictions. It also imposed two 25-year-to-life terms for the firearm discharge enhancements, and a 15-year-to-life term for the second degree murder conviction, as well as the three-year upper term for arson.

## DISCUSSION

On appeal, defendant challenges the finding that he was not in custody when police interrogated him. He maintains that based on the factors cited in *People v. Aguilera* (1996) 51 Cal.App.4th 1151 (*Aguilera*), the interview was a custodial interrogation, triggering the requirement of a *Miranda* admonishment and waiver.

Defendant argues that although he agreed to the interview, the voluntary nature was diminished by the surrounding circumstances. According to defendant, the

---

were probably turning to run for their lives, and that's why they suffered wounds to the left sides of their bodies instead of from the front, which is what you would expect if they had been shot while attacking [defendant]."

[4] A pathologist opined that R.J. was alive when the car was set ablaze based on carbon monoxide found in his blood.

3

interview's express purpose was to question him as a suspect. He was interrogated in a small room far from his home. While he was told he was not under arrest "right now," the fact that his phone and money had been taken indicated his liberty had been restricted. Similarly, the offer to leave was not viable because his money and phone were taken, and he had only been offered a drive back to Chico, not his home. And while no explicit restrictions on his freedom were made, the interrogation lasted two hours, he was outnumbered three-to-one, and detectives dominated and controlled the interrogation.

Defendant also argues the detectives were aggressive, confrontational, and accusatory, manifesting a belief defendant was culpable, asserting they had evidence to prove it, and expressing skepticism of his answers. They also used interrogation techniques including isolating defendant in a small room and attempting to ingratiate themselves with conversational chit-chat and sympathy. Finally, though defendant was not told he was under arrest after the interview, the detectives spoke of doing a crime scene walk-through, gave a *Miranda* warning, and "maintained custody" of defendant — suggesting custodial interrogation. Defendant argues that these circumstances establish that he was subjected to custodial interrogation.

We disagree. At the outset, we emphasize that simply reading the interview transcript and the appellate briefing does not reveal the entire picture. Indeed, by focusing only on those things, one could very well gain an erroneous impression. The recording of the interview, however, fully illuminates the picture to be discerned. And as we shall discuss, based on the totality of the circumstances, we conclude defendant was not in custody for purposes of *Miranda* during his initial interview with the police.

### A. Additional Background

Before trial, defendant moved to suppress his statements made to investigating officers. At the hearing, two detectives testified. In addition to the testimony, the trial court watched the video recording of the interview.

4

## 1. Testimony of Detective Matt Calkins

Sheriff's detective Matt Calkins testified that he, along with 20 to 25 officers in SWAT or riot gear, arrived at defendant's hundred-acre-plus property to execute a search warrant. When they executed the warrant, they were unsure how many people were on the property.

At the scene, Calkins saw defendant being brought out of his residence, wearing plastic flex cuffs with his hands in front of his body. Calkins testified that it is the general practice to temporarily detain persons encountered while serving a search warrant, particularly as part of a homicide investigation. Defendant remained handcuffed for approximately five minutes; at that point District Attorney Investigator Patrick McNelis had a SWAT officer remove the flexcuffs. Defendant was not questioned while cuffed.

At some point, defendant was asked if he would accompany the detectives to the sheriff's department for an interview. Defendant agreed. Defendant was then driven to the sheriff's department in an unmarked Ford Expedition that had no screen enclosure. He was neither restrained nor questioned during the drive.

At the sheriff's facility, defendant was taken to the "soft interview room," a room with a couch, table, and a couple of chairs. The door to room was not locked, nor were other doors leading to the outside.[5] When asked if defendant "could have gotten up and walked out" "if [he] desired," Calkins answered, "Yes."

After about 10 minutes of discussing unrelated matters, the detective told defendant he was not under arrest, he was free to leave, and they would give him a ride back to Chico if he wanted. Calkins testified that defendant appeared to understand.

---

[5] The room is located upstairs in the Sheriff's department facility. To get there, one has to go through two doors. The first door is unlocked to people entering and exiting. The second door is unlocked to people exiting.

After the interview, defendant was not handcuffed. They drove defendant back to his property, stopping on the way at a Starbucks in Chico for coffee and food. During the suppression hearing, neither the prosecution nor the defense asked any questions concerning what occurred at Starbucks or thereafter or anything about whether defendant was restrained or when he was placed under arrest.

## 2. Testimony of District Attorney Investigator Patrick McNelis

District Attorney Investigator McNelis testified that he was part of the search of defendant's property and saw that defendant was restrained by flexible handcuffs for less than five minutes. After the cuffs were removed, McNelis told defendant he was not under arrest and was free to leave. Defendant, nevertheless, agreed to come to the sheriff's department for an interview.

## 3. The Trial Court's Ruling

The trial court denied the suppression motion, finding defendant was not in custody for *Miranda* purposes. Doing so, it noted that it had considered seven factors: (1) whether formal arrest or its objective indicia are present; (2) the absence of formal arrest; (3) the location of the interrogation; (4) the officer-to-suspect ratio; (5) the officers' demeanor; (6) the length, nature, and form of questioning; and (7) whether the investigation was focused on the suspect.

As to those factors, the trial court found defendant had been detained on his property for five minutes and released; he was not formally arrested. The length of detention was unclear, though the court noted the recorded interview lasted two hours, and the drive from defendant's property was about 50 minutes. The site of the interview was the Sheriff's department's "soft interview room," which was unlocked, with people freely moving in and out. And while the officer-to-suspect ratio at defendant's property was "high," during the interview it was three-to-one.

The trial court found the demeanor during the interview was "conversational" and "casual," though the court noted it became "the most confrontational" before defendant

6

made admissions. Even then, the court found, "It's still conversational in tone, but the questions do come more quickly and the questions come from multiple sources." The court, however, noted the absence of raised voices, table pounding, or leaning into defendant's space. And as to the length, nature, and form of questions, the court found the questions preceding the confession "very open-ended," "inquisitive," and while pointed, gave defendant the opportunity to "tell what happened."

Finally, the court found the interview questions did "not necessarily focus on [defendant] as would have been perceived by a reasonable person" but were also "inquisitive of other people that are involved or live on the property." The court also noted that defendant had been advised of his right to leave at any time appeared to be supported by the fact defendant was not restrained and that he was offered "niceties" like coffee and the ability to use the restroom.

## B. The Recorded Interview[6]

We have reviewed the video recording. Present at various times during the interview with defendant were Calkins, McNelis and Deputy District Attorney Marc Noel. As the trial court noted, the tone was casual and conversational.

There was no testimony about the actual dimensions of the "soft interview room" where the interview took place, but from the video recording, we note it contains a couch, which appears to be a standard size with space enough for three adults to sit. There is a chair and part of a table in view of the camera. The table appears to be the size of a standard card table. There is a chair situated by the door, near the doorknob. The top half of the door consists of a glass window. The window appears to be two-way glass; people inside the room can see out into the hallway and vise versa. The door was not

---

**6** There are discrepancies between the transcript and what can be heard on the video recording. We note pertinent discrepancies in footnotes, *post*.

locked; the detectives freely exited and reentered during the interview without manipulating the doorknob, and anyone sitting inside the room could see that.

The video recording begins with defendant and Noel walking into the room. Defendant asks, "Where do you want me to sit?" Noel replied, "Anywhere you're comfortable." Defendant chose the chair near the door. In doing so, he pointed to the couch and stated, "If I sit in that I ain't gonna get up." Defendant was asked about coffee, and coffee was provided. He was not handcuffed.

While awaiting the coffee, small talk, mostly initiated by defendant, ensued for a few minutes between defendant and Noel.[7] During this time, the door was fully open. Calkins and McNelis were not present. After a few minutes, McNelis brought defendant coffee, Noel left to use the restroom and when defendant asked for cream, McNelis left to look for some, leaving defendant in the room by himself with the door fully open.

When McNelis came back with cream, defendant asked, "who got my money?" Calkins came in around that time. The two detectives respond, "Oh, it's in the car," "Yeah. We got everything," and, "It's not going anywhere." McNelis left. Calkins sat on the couch. Calkins and defendant engaged in small talk, mostly about defendant's animals. The door remained fully open during this time. Noel came back in the room during this time, and the door remained open. Small talk continued.

Shortly thereafter, McNelis returned. He shut the door, explaining to defendant that he did that so they could hear. Defendant acknowledged by saying; "Yeah." McNelis took a seat out of view of the camera, on the side of the table adjacent to defendant. Small talk continued, during which Calkins and McNelis asked about Ben, one of the people residing on the property with defendant.

---

[7] For example, defendant brought up the subject of his favorite part of the day being early morning, his animals and a tavern he once ran.

McNelis then told defendant, "we appreciate you coming down here so we can … [¶] … talk. I sure appreciate that." Defendant responded, "I don't know what for …" and "I don't know why you … couldn't talk to me out there." Calkins replied, "it's just too loud and too many people out there, you know?" To which, defendant responded, "Oh."[8] Defendant's demeanor as depicted in the video recording suggests he understood. Calkins went on to say, "I like to sit down and be able to talk to you," and further explained, "We want to show you pictures and stuff like that."

Noel joked about the way they had awoken defendant, and defendant acknowledged hearing a helicopter and multiple people. Defendant said that instead of the multiple deputies that had come to his property, one person would have been enough because he was not dangerous. But then defendant acknowledged the deputies did not know who was on the property. He implied he understood the need for the police presence because his father had been a Highway Patrol officer and because of news related to assaults and high speed chases he hears almost daily on the radio — "just all kinds of bullshit." He said he would not want to be a cop and added "it's terrible." When Noel further explained the need for the number of deputies who arrived, saying they "played it safe" because they did not know who might be on the property, defendant responded, "ah, shit"[9] and his demeanor suggests acknowledgment of what Noel was saying.

Small talk ensued thereafter, including defendant making jokes the others laughed at. When defendant mentioned having previously worked 20 years at a desk talking to people on a phone and that he hates talking to people on the phone, Noel asked whether

---

[8] The transcript says defendant responded, "No." In our review of the recording, we hear "Oh."

[9] The transcript says defendant responded, "Oh, shit." We hear "ah, shit."

he currently had a phone. Defendant, apparently joking said he had a phone "[b]ut somebody stole it."[10] McNelis told him his phone was "in the car."

Calkins, sitting on the couch in a relaxed posture with one leg crossed over the other, then said, "Well, Don, you know you're down here…and that you're not under arrest right now. You know that, right? We explained that to you out there." Defendant answered, "Yeah," and nodded his head up and down. "And that you're not under arrest here right now, and … basically anytime you want to get up and go you can do that. Okay? We can give you a ride back to Chico, okay? Defendant responded by nodding his head down and up. It's just stuff we want to talk about and we appreciate it if you'd talk with us, okay?" Defendant replied, "Yeah, no problem," again nodding affirmatively and sipping coffee while he did so. Calkins then said, "So that's—that's why we're down here and, uh, we're gonna go over everything and start hearing then about—about what this is all about and, um, and—and go from there. So we just want to let you know that you're not under arrest and you—and you can go anytime you want. Okay?" Noel said, "Right" and Calkins followed up with "Fair enough?" Defendant again sipped his coffee and nodded his head up and down.

Noel said, "You were cuffed up briefly out there. As soon as everything got secured, we knew you weren't a threat and, you know, cut the cuffs off[,] you been-been uncuffed and everything. . ." Defendant interjected, "What could a 72-year-old man do against 20 or 30 guys?" McNelis said, "Exactly," and "that's why we took them off, buddy." Defendant then volunteered, "But . . . if I was mentally deranged" and then, as an example talked about an unrelated incident he had observed involving the police encountering a person with apparent mental health problems. He also mentioned hearing stories from his father.

---

[10] It appears defendant was joking, because he laughed when he said this.

10

After some additional small talk, defendant said, "So anyway, go ahead." McNelis told defendant, "we wanted to . . . clear some stuff up. . . and we need your — your help and want to talk to you about some stuff and get your help so we can understand some stuff. Calkins then said, "Yeah, That's why we're here. I mean, do you have any idea why you're here?" After defendant responded that he did not, Calkins asked, "[has] anybody visited you on your property lately?" Defendant readily responded, "Just . . . [R.J.] and his buddies." Defendant was then asked questions concerning his relationship with R.J. Defendant explained that R.J. had lived on the property at one time. He explained that R.J. had stolen property from him and had a reputation for stealing property from other people.

Thereafter, there was discussion about defendant's encounter with R.J. and the people who were with him the previous week when he came to the property. He said the group, consisting of R.J. and a woman and two males, had asked him for gas. Defendant said he told R.J. he would give him the gas, but he was not welcome there because he stole property and he could not come back until he promised not to steal. Defendant said he gave the group some gas and they drove off. Defendant said he thought R.J. thought he was going to be able to stay on the property and had been taking things out of their car.

Later, Calkins told defendant that R.J. was missing and nobody knew what had happened to him. Defendant said his friend Eric, who sometimes stayed on the property, had talked to R.J.'s mother and she had said R.J. was missing. Calkins told defendant, "[T]hat's the reason we're up here is 'cause nobody can find [R.J.] or the people he was with. And the last place they were known to be headed was over to your property. Calkins's tone was conversational, and he was leaning back on the couch, almost reclining, with his arms spread across the top of the couch and one leg crossed over the other. Calkins, still in the same position and in the same conversational tone of voice said, "And . . . this is the opportunity for you if . . . something happened up there. If

11

something went down. And now's the time to tell us what happened." Defendant responded, "No. They got in their car and . . . drove off. You know." Defendant denied that the group had tried to steal from him. Calkins disparaged the group, saying they were not "innocent kids," they had criminal histories and the deputies knew R.J. had stolen from people.

Thereafter, discussion focused on defendant's friend Eric, his conversation with R.J.'s mother about R.J. being missing, his connection to R.J., R.J.'s family, and the neighbor and Eric's connection to the property. Asked if anyone else was on the property the day R.J. was there, defendant said Ben could have been there, but he was not sure.

Leaning back, with his hands resting on the back of his head, Calkins said they had talked to people who said they heard gunshots that night. Defendant responded, "At night?" His tone seemed to be one of surprise. Later, McNelis asked what type of guns defendant owned and defendant said a .22 an "old 410."

Later, asked if the CSI personnel would find blood on the property, defendant said none that he knew of. Calkins, sitting stretched out, with one arm resting on the top of the couch and the other on the arm, said, "I mean, you're a real nice guy. You're a real smart guy. If something went down up there, you know we're gonna find out about it and I'd rather just hear the truth." McNelis followed, "These are people that are up there stealing stuff and, I mean, if something happened with one of them. . ." Calkins again said, "They're not innocent people." Defendant responded, "No. It happened just like I told you. I don't — I can't think of anything else."

Noel suggested maybe "Ben[] [was] around someplace." Defendant acknowledged Ben could have been there but said he did not think Ben knew them. Thereafter, there were more questions about Ben. McNelis asked if defendant wanted more coffee and he and Calkins left. A few minutes later, McNelis returned with coffee and resumed his seat. He joined in the conversation, asking about Ben, and when Ben had last been on the property. McNelis then returned to questions about defendant's

12

encounter with R.J. and the people in his group. Defendant mentioned they had brought some things in and he helped them load them back into their car. The conversation then again turned to other people, including Ben, Eric and the neighbor. Calkins returned to the room a few minutes later.

Shortly after Calkins came back in, he asked defendant about a blood stain he noticed on defendant's pants. Defendant explained he had had a bloody nose and agreed to let the deputies collect a sample, saying "that's my blood."

McNelis told defendant there were surveillance cameras in the area and those cameras had only showed three people in the victims' car, not four people as defendant had said. Defendant said he did not know where the fourth person had been picked up. He said they were on their way to buy marijuana and the fourth person talked like a local.

Later, Calkins asked whether Ben had "do[ne] something to these people" and asked whether Ben had any guns. Defendant said he was unsure Ben even knew R.J.

Later, McNelis told defendant that deputies were on the property and asked defendant whether they would find anything. Calkins, leaning back on the sofa with his leg crossed, said, "We're not trying to railroad you, Don. We just want the story. We want to understand it." Defendant responded he had told them what he knew. Calkins responded, "No more to it, huh?" and defendant said, "I can't think of anything."

Thereafter, there was additional discussion about other people, including the neighbor, Ben, and whether Eric was there that night. Around this time, Calkins left the room. They also asked defendant about phone conversations he might have had that night, including with Eric, and defendant volunteered that the deputies could check his phone. When Calkins returned, they were still talking about other people.

After discussion about other people, McNelis asked if defendant knew about DNA. Defendant said he did. McNelis asked if defendant went into R.J.'s car, and defendant said he did. Defendant said he went into the back seat to get a BB gun. He

13

also said he had been in the front seat and trunk. Calkins left the room to answer a phone call.

With Calkins still out of the room, McNelis said they had recovered a lot of DNA throughout the car. Defendant said he was "helping them pack stuff," and then he got the BB gun. McNelis told defendant in a conversational tone: "Don, you're a nice enough guy. Likable guy. Very polite with us. I don't have anything against you. You're up there doing your thing. You're respectful. You're polite to me. Had a nice conversation. And it just . . . And, you know, sometimes things happen. And, things happen, and you know, these people were up there thieving your shit. Things happen. You know that. And I know that, too. And I'm not accusing you of being a bad person or anything. I need to know the truth about that. You know, these people steal your shit, they come on your property, you know, I know it's hard. I know you probably want to tell me, but it's hard. Some shit went down, Don. Keeping it real, something happened." Defendant responded, "I don't know anything else I can tell you." McNelis responded, "We'll let you think about it for a second, okay? Let me get you some more coffee, and let you think about it for a second." As McNelis left the room, defendant asked for some more sweetener as well.

Noel remained in the room, sitting back on the couch. Defendant said he knew they did not believe him, and Noel told defendant, "it's not necessarily that we don't believe you. . . . one and one equals two. And two plus one equals three . . . and right now we're having difficulty adding all the numbers and . . . trying to figure it out." Noel continued, "And right before they got to your property this last time they've been seen. And we know that the car that they were in is found a few hours later burned with three dead bodies in it."

Around this time McNelis and Calkins came back in momentarily. McNelis confirmed defendant still wanted coffee and the two detectives left the room. Noel continued, saying they had to figure out what happened and hoped defendant "could fill

14

in some of those blanks for us so that stuff would add up."  He went on to say they had heard about people hanging out the neighbor's house.

Around this time McNelis and Calkins and returned and resumed their seats, closing the door after they entered.  McNelis asked defendant about another person. McNelis then asked defendant why some of R.J.'s "stuff" was still on his property. Defendant said he did not know.

Calkins, leaning forward asked in a conversational tone, "did you shoot them, Don?"  Defendant responded, "No. No, I didn't."  Calkins then asked,  "Do you know who did?  Defendant responded, "No," and followed up with "I didn't know they were shot."  McNelis then said,  "Don.  This isn't gonna go away, okay."[11]  Defendant responded, "I realize that, but I . . ."[12]

McNelis remained and suggested to defendant that the group was trying to steal from defendant and explained that law enforcement often responds to robberies where the person who is being robbed shoots the robbers.  Around this time Calkins and Noel left the room.  McNelis went on to say, "What I don't understand is after this went down and there's three of them, and there's one of you, and you're an old man.  Why didn't you just call us . . . I don't understand why you didn't just call us.  It — it's okay.  Don[,] Just tell me the truth.  You're not a bad person.  I just don't understand why you guys didn't call.  Something went down, and I just don't — I know.  Your DNA . . . "[13]  McNelis's

_____

[11] The transcript says:  "Don.  This isn't gonna go right. Okay?"  We hear:  "This isn't gonna go away, okay."

[12] The transcript says defendant responded:  "I know you don't understand, but I . . ." We hear:  "I realize that, but I . . ."

[13] The transcript indicates Noel said the last four sentences in this quote.  That is not accurate; he and Calkins were not in the room at the time.  McNelis said this.

15

tone remained conversational.  Defendant interrupted, saying they "were being nice" and he did not feel he was in danger.

Calkins and Noel reentered about a minute after leaving and Calkins took a seat off camera apparently next to McNelis.  McNelis said, "Don, just tell us what happened."  Calkins said, still in a conversational tone, "You're not a bad guy, Don, we know that.  But something happened.  You got put in the position where you had — what happened."  McNelis said, also in a conversational tone, "There's stuff at your house. They're finding stuff as I speak."  Calkins said, "Get it off your chest, man."  McNelis followed up, "Just put it out here, Don."  McNelis told defendant, "Don, you drove their car.  I didn't just show up at your house today, Don.  You were — you were in their car. I mean, you were in their car.  You put stuff in their car."  McNelis's tone changed slightly, but while it was pointed, it was still conversational.  Defendant said, "yeah." McNelis followed up with, "I understand you're not telling me all the information but we've done our homework.  You were in their car.  Weren't you?"  Defendant replied, "I said I was.  I said I was."  Calkins, in a conversational voice said,  "Don, I think you feel bad about what happened."  Noel, in a conversational tone said the numbers were not adding up and that there were pieces missing.  He said they knew R.J.'s group was going to defendant's place.

After telling defendant there were video surveillance cameras owned by marijuana growers and law enforcement in the area, McNelis said they knew only three people were in R.J.'s car.  He said they knew what cars defendant had driven.  McNelis said something happened and "You're not telling me the truth."  Calkins, said, "Let's just start over, Don, and just — and just start over with the truth.  Okay?"  McNelis followed with, "Please, Don" and told defendant his DNA was "all over that car."  Calkins said, "So

16

they show up on your property" and then asked, "How many people show up, Don?[14] McNelis said, "It's on the steering wheel, the back seat, the front seat. So, please, Don."[15] The tone remained conversational throughout this time, although McNelis's statement "please, Don" sounds like begging. Calkins asked again, "How many people show up, Don?" Defendant took a sip of coffee and replied, "Okay. Three." McNelis said, "Okay, thank you."

McNelis asked, "Did they try to rob you? What did they do? Defendant explained, "[R.J.] got smart with me and he got me. . . . And I had the shotgun." McNelis asked where defendant shot R.J. and defendant said it happened down by the trailer and the other two were shot at the same location. Calkins asked, "What'd they do?" Defendant said, "[R.J.] grabbed the gun and I pulled it away from him and the gun went off." McNelis asked, "Why'd you shoot the other two afterwards?" Defendant responded, "[T]he other guy picked up . . . a BB gun and was coming at me like he was gonna hit me with it and swinging. Just swinging . . . you know. And so I shot him. And then the girl come at me with a knife and I shot her." Calkins asked if he felt bad and defendant said he did, explaining, "I don't wanna kill anybody. You know? . . . I didn't intend to kill them. But it happened."

Defendant volunteered that he hid the shotgun he used in a storage unit in town. He also volunteered to give the detectives the keys and take them to it.

Later, when asked what time this had happened, defendant said sometime after 12 noon, and stated, "And [R.J.] had . . . all this stuff. And they each had packs, and bags of stuff. And quite a bit of stuff. And . . . so . . . I told him, 'You're not wanted here.' I said "You stole from me. You stole from [the neighbor]. You stole from everybody that

---

[14] The transcript indicates McNelis asked this question, but it was Calkins.

[15] The transcript indicates Noel said this, but it was McNelis.

you come into contact with.' And he said. . . . 'Well, I'm staying' And I says, 'No, you're not.' And so I went and got the shotgun because I figured I can scare him off. And that's all I wanted to do was scare him off. I didn't want to hurt nobody, you know? And . . . he — I guess I wasn't paying attention, but he grabbed the gun and I pulled it out. And when I pulled it out it went off." And the other male "picked up the — the BB gun and was . . . swinging at me" and the woman came at defendant with a knife. Discussion thereafter turned to other details, including what defendant did after the shooting and burning the car.

Later, McNelis asked defendant if he would be willing to go up to where he burned the car. Defendant replied: "Yeah, I guess." Calkins said, "I know it's a lot." Defendant replied, "I don't have any choice," and chuckled. Noel said it's up to you, and defendant said, "I'll cooperate . . . with you as best I can." He added, "Because . . . you know, I got caught in a position that was . . . just self-defense and I got scared. You know?" Later, when McNelis asked defendant about doing a walk through at his property defendant agreed, stating, "I want you to understand." Later, he again explained, "I just got caught . . . in a situation and I was scared."

Towards the end of the interview, McNelis indicated they were ready to go and gave defendant the *Miranda* advisement, defendant said he understood each right, and said "no problem" when asked whether he was willing talk to them. Defendant then said "it's something that happened. I didn't want it to happen. I feel bad about it, but I can't control it," adding, "like I say, I was scared." Defendant was not handcuffed when they later left the room.

What happened after the interview at the Sheriff's facility was not developed during the suppression hearing. Based on the trial record, following the interview at the Sheriff's facility, defendant showed the detectives where the shootings took place at the property where he was residing. Their conversation was video-recorded and shown to the jury at trial. Defendant then showed the detectives the airport storage unit where he hid

18

items related to the shooting. This conversation was also video-recorded and shown to the jury at trial. Finally, defendant accompanied the detectives to the scene where the car was burned, which was about eight or nine miles from the property where defendant resided. This conversation was also video-recorded and shown to the jury at trial. They discussed the events that took place at each of these locations. The record of the suppression hearing does not reveal when defendant was placed under arrest.

## C. *Miranda* and Custody Principles

An interrogation is custodial for *Miranda* purposes, "when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.] Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. [Citation.] When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his situation." (*People v. Moore* (2011) 51 Cal.4th 386, 394-395 (*Moore*).) The question to be resolved is "would a reasonable person in the suspect's position during the interrogation experience a restraint on his or her freedom of movement to the degree normally associated with a formal arrest[?]" (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 35 (*Bejasa*); *Aguilera*, *supra*, 51 Cal.App.4th at p. 1161.) "[W]e accept the trial court's findings of historical fact if supported by substantial evidence but independently determine whether the interrogation was 'custodial.' " (*Aguilera*, at p. 1161.) We have done that here, based on the testimony developed at the *Miranda* hearing and our review of the video recorded interview.

As defendant notes, the court in *Aguilera*, identified factors courts should consider in determining the question of custody from the perspective of a reasonable person: "[1] whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, [2] whether the person voluntarily agreed to an interview; [3] whether the express purpose of the interview was to question the person as a witness or a suspect; [4]where the interview took place; [5] whether police informed the

19

person that he or she was under arrest or in custody; [6] whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; [7] whether there were restrictions on the person's freedom of movement during the interview; [8] how long the interrogation lasted; [9] how many police officers participated; [10] whether they dominated and controlled the course of the interrogation; [11] whether they manifested a belief that the person was culpable and they had evidence to prove it; [12] whether the police were aggressive, confrontational, and/or accusatory; [13] whether the police used interrogation techniques to pressure the suspect; and [14] whether the person was arrested at the end of the interrogation."  (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.)

As the *Aguilera* court emphasized, "[n]o one factor is dispositive.  Rather, we look at the interplay and combined effect of all the circumstances to determine *whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest*."  (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162, italics added.)

### D.  Analysis

We conclude the trial court correctly found that defendant was not in *Miranda* custody during the recorded interview at the Sheriff's facility.  There was no formal arrest and looking at "the interplay and combined effect of all the circumstances," we conclude that "on balance they [did not create] a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.)

Looking to the *Aguilera* factors, we note the following:  defendant voluntarily agreed to an interview and voluntarily accompanied the detectives to the Sheriff's facility; contrary to defendant's assertion, there was no "express purpose to interview defendant as a suspect," the detectives asked about a number of other people during the

20

interview and even asked defendant if he knew who shot the victims[16]; defendant was never told he was under arrest; rather, he was told he was free to terminate the interview and leave at any time and his conduct indicated an awareness of his ability to do so; the detectives were not at all aggressive during the interview; the officer ratio was three to one, but we find this insignificant given the conversational tone of the interview[17]; and as far as we can tell, defendant was not arrested until some point after the interview at the sheriff's facility took place. We discuss pertinent circumstances in more detail below that demonstrate a reasonable person would not have "experienced a restraint tantamount to an arrest." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.)

---

[16] This case is unlike *People v. Saldana* (2018) 19 Cal.App.5th 432 (*Saldana*), where prior to the interview of the defendant about crimes of child sexual molestation, the investigators had already interviewed all of the witnesses and victims and thus knew about defendant's culpability. Based on this, the court concluded: "the sole purpose of the questioning was to obtain a confession." (*Id*. at p. 456.) Here, while the detectives thought something happened on the property, they did not know who was culpable or who might simply have information about who was culpable. And a plausible scenario, based on the record before us, was that R.J. and the people he was with came to the property to steal. Moreover, although the detectives indicated they thought defendant had information, they never expressly communicated to defendant that he was a suspect. As to this, it is important to note that the United States Supreme Court stated some 27 years ago: "We hold, not for the first time, that an officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody." (*Stansbury v. California* (1994) 511 U.S. 318, 319 [128 L.Ed.2d 293.)

[17] Defendant asserts the detectives dominated the interview. The *Aguilera* court did cite as a circumstance to consider "whether [the investigators] dominated and controlled the course of the interrogation," but this circumstance seems more pertinent where the tone is aggressive and pressuring. In all interviews, the detectives will dominate and control the course of the interview simply because they will be asking the questions and thereby controlling the topics of conversation. In any event, we note that during the interview here there were several times the detectives let defendant talk and joke about things that were off topic.

### 1. The Initial Detention

Defendant makes much of the fact he was detained and placed into handcuffs at his home. But this circumstance does not necessarily mean he was in custody for purposes of *Miranda* when he gave the later statement at the Sheriff's facility, attenuated from the original detention. Indeed, courts have found circumstances to be noncustodial when there is even less attenuation.

For example, in *In re Joseph R.* (1998) 65 Cal.App.4th 954 (*Joseph R.*), a CHP officer, investigating a rock throwing incident perpetrated by juveniles showed up at the minor's house to investigate. The officer told the minor he did not have to talk, but wanted to ask a few questions about the incident. (*Id*. at p. 957.) Thereafter, he told the minor a witness had seen him throw the rock. (*Ibid*.) When the minor denied involvement, the officer placed the minor in handcuffs and detained him in the back of his patrol vehicle for about five minutes. (*Ibid*.) The officer then took the minor out of the car, removed the handcuffs, and began asking him questions about the incident. The questioning began with the officer telling the minor that was " 'a pretty stupid thing' " to throw rocks at a bus and the minor made admissions, first agreeing with the officer's characterization of his conduct being stupid. (*Ibid*.) The *Joseph R.* court held that the minor was not in *Miranda* custody at the time he made the incriminating response, reasoning: "[the questions] were only put to [the minor] *after* he was released from the police car and the handcuffs were removed. Moreover, the restraints were applied only briefly—for five minutes—before questioning began. Never, during his contact with the officer, was [the minor] told he was under arrest or that he would be placed under arrest unless he cooperated with the officer's investigation. On the contrary, he was told he was under no obligation to answer any of the officer's questions." (*Ibid*.; see also *People v. Thomas* (2011) 51 Cal.4th 449, 477-478 [citing *Joseph R.* with approval on this point].)

Here, during the search of the property where defendant resided, defendant was handcuffed, but only briefly — five minutes — before being released. And he was not

questioned while handcuffed. As in *Joseph R.*, there is no evidence indicating he was told he was under arrest or that he would be placed under arrest unless he cooperated with the investigation. (See *Joseph R.*, *supra*, 65 Cal.App.4th at p. 957.) To the contrary, once the handcuffs were removed, McNelis explicitly told defendant he was not under arrest and he was free to leave.

Later, during the interview at the Sherriff's facility, defendant was told why he had been handcuffed — essentially that it had nothing to do with him, but rather it was done for officer safety. A reasonable person after hearing this explanation would understand the brief handcuffing did not signal an arrest. Indeed, defendant acknowledged the need for the large police presence at his property and his detention, volunteering that the deputies did not know who was on the property, suggesting that they did not know whether there was a mentally disturbed person there and further implying knowledge of why he had been temporarily detained based on his father having been a CHP officer and stories he had told defendant.

We also find it significant that the restraints were never reapplied during the interview. This circumstance would signal to a reasonable person that not only did the original handcuffing have nothing to do with arrest, but also that while he remained uncuffed, no similar restriction on his freedom was taking place.

**2. The Environment Where the Interview Took Place**

We begin here with an observation another panel of this court recently made: "The fact that an interrogation occurred at the police station does not, by itself, render the interrogation custodial." (*People v. Potter* (2021) 66 Cal.App.5th 528, 540 (*Potter*).)

Defendant asserts that the room he was in was a "small," implying that this circumstance suggests custody. In our view, from a reasonable person's perspective, the room had the appearance of a break room. Furnished with a couch, table and chairs, the room was large enough for four men to sit comfortably for two hours. It was not a windowless interview room. It had a glass window in the top half of the door allowing

23

people inside to look out and people in the hallway to look in. The room was not imposing or isolating.

Defendant argues that they went through doors at the Sheriff's facility to get to the interview room. But here, the evidence is that the two doors they went through were unlocked for people leaving the area where the interview took place. Moreover, our high court has recognized, even when an interview room is in a secure area of a police facility that circumstance does not necessarily require a finding of custody. (*People v. Ochoa* (1998) 19 Cal.4th 353, 403 [where defendant driven to the police facility in a police vehicle]; see also *Potter*, *supra*, 66 Cal.App.5th at p. 540 [where defendant came to the police facility on his own].)

Defendant was made to feel comfortable and provided coffee throughout the interview. The detectives were accommodating, making sure to find him cream and sweetener.

We do not find the environment where defendant was interviewed to be coercive or to be one where a reasonable person would have "experienced a restraint tantamount to an arrest." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.)

**3. The Initial Entry into the Room and Early Part of the Interview**

When defendant first came into the room, he asked where they wanted him to sit and was told anywhere he felt comfortable. Defendant picked the seat he wanted. This circumstance cuts against a finding of *Miranda* custody.

For the first six minutes, the door was left fully open. And for a little over a minute, defendant was left in the room alone with the door fully open while McNelis went to get cream for the coffee defendant sipped while waiting. Leaving the door open would communicate to a reasonable person that the earlier restraint at his residence was not an arrest and he was not then in custody as he sat in the interview room; rather, a reasonable person would feel he was free to leave, just as defendant had been told before leaving his residence.

24

When the door was closed, defendant was told it was so they could hear. Defendant's response and demeanor as depicted in the video recording suggests he believed McNelis when he said that. Again, the glass window allowed defendant to see outside and allowed other people to look in. Even with the door closed, the environment was not isolating or coercive. And, as noted, anyone in the room would have noticed that the door was not locked as no manipulation of the doorknob was necessary as people left the room. Under the circumstances, we conclude the fact the door was closed throughout the interview did not signal custody.

### 4. What Defendant was Told about His Status

At the scene, McNelis told defendant he was not under arrest and was free to leave. Defendant nevertheless agreed to accompany the detectives to the Sherriff's facility for an interview.

At the facility, what he had been told about being free to leave was reenforced. Three times he was told he was not under arrest and free to leave: "Well, Don, you know you're down here . . . and that you're not under arrest right now. You know that, right?"; "you're not under arrest . . . anytime you want to get up and go you can do that"; and "you're not under arrest and you . . . can go anytime you want. Okay?" Each time, defendant responded affirmatively: "Yeah"; "Yeah, no problem"; "Right," and nodded affirmatively.

Defendant makes much of the 50 minute drive and the offer to take him back to "Chico" as opposed to an express offer to take him home. But there is no indication defendant took it to mean he would only be driven to Chico and not his residence if he chose to leave. Nor is there anything to suggest a reasonable person familiar with the area would believe a statement to take him back to Chico was not the same as saying they would take him home. Indeed, while defendant lived in a rural area, both his motion to suppress and the criminal complaint provided the address of his rural property, listing Chico as the city.

25

Here, from the time defendant was told he was free to go, to the time he admitted killing the victims in self-defense and then later *Mirandized*, neither the detectives nor the deputy district attorney did anything that would cause a reasonable person "to experience a restraint on his . . . freedom of movement to the degree normally associated with a formal arrest." (*Bejasa*, *supra*, 205 Cal.App.4th at p. 35; *Aguilera*, *supra*, 51 Cal.App.4th at p. 1161.)

## 5. Defendant's Money and Phone

Defendant asserts that his money and phone were "taken" from him and thus, he was not free to leave. There is no evidence in the record that defendant's money was *taken* from him. When defendant asked about the whereabouts of his money, McNelis told defendant his money was in the car and "It's not going anywhere." As for his phone, there was only defendant's apparent joke that it had been stolen from him.[18] McNelis told him his phone was "in the car." Based on this testimony, the inference to be drawn is the money and phone were merely *left* in the car. This circumstance actually cuts against a finding of *Miranda* custody. If the items had been brought inside to some location to which defendant did not have access, that likely would have signaled to a reasonable person that he was there to stay and not free to leave. Instead, because these items were left in the car, that circumstance signaled that if defendant decided to leave and take the detectives up on the offer to drive him back to Chico, those items would be

---

[18] At oral argument, appellate counsel argued that defendant's phone and money was "seized" from him, but there is no evidentiary support for this claim. Counsel also represented that defendant "complained" about his phone being taken from him. There is no evidentiary support for that representation. As we have noted, the subject of defendant's phone first came up after defendant said he had worked at a desk job for 20 years where he was on the phone all the time and that he hated talking on the phone. Noel asked defendant if he had a phone and defendant made an apparent joke that someone had stolen it. (See fn. 10, *ante*.) Defendant never "complained" about his phone being taken.

waiting for him in the vehicle. (Cf. *People v. Delgado* (2018) 27 Cal.App.5th 1092, 1105 [defendant in custody where he was told he was free to leave but an officer demanded access to his cell phone before allowing him to leave].)

### 6. Nature of the Questioning

We agree with the trial court that the tone of the interview was conversational throughout. Similar to our high court's observation in *Moore*, *supra*, 51 Cal.4th 386, "For a substantial period . . . the questioning did not convey any suspicion of defendant or skepticism about his statements. [¶] After a while, to be sure, the detectives interjected some more accusatory and skeptical questions." (*Id.* at p. 402.) But as our high court noted in *Moore*, "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, *or because the questioned person is one whom the police suspect*.' [Citation.] While the nature of the police questioning is relevant to the custody question, police expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody." (*Ibid*; see also *Potter*, *supra*, 66 Cal.App.5th at p. 541.)

In many cases, when the police engage in accusatory questioning, rejection of denials and confrontation with evidence, this circumstance cuts in favor of a determination of custody (at least from that point on). (See *Saldana*, *supra*, 19 Cal.App.5th at pp. 457-458 ["Where. . . police indicate to the defendant their resolute belief he committed the crime, the custody inquiry becomes whether a reasonable person in the defendant's situation—i.e., having been told by the police that they know he committed the crime—would think he was free to break off the interview and leave"].) But that is not the case here. Even when the detectives confronted defendant with evidence, they maintained their conversational demeanor. And thematically, they did not accuse defendant of a crime; rather they suggested the victims had committed a crime against him, and their statements to defendant focused on an innocent or legally

27

justifiable explanation for why he may have killed the victims. The detectives disparaged the victims, implied they thought the victims had tried to rob defendant and that anything defendant did would have been justified. At one point, McNelis seemed to beg defendant to tell them what happened: "Please, Don." A reasonable person in defendant's position, under these circumstances, would have felt the detectives were treating him as a victim, not a suspect, and not experienced a restraint tantamount to an arrest.

Nor did the nature of defendant's statements tip the scales. When a person confesses to a crime, that circumstance in some situations might cause a reasonable person to conclude his noncustodial status has changed. But here, defendant did not confess to a crime regarding the victims. He said he acted in self-defense — he acted because he was scared and had been attacked. Under the circumstances of this case, given the exculpatory nature of defendant's statements, we conclude that even after he made these statements, a reasonable person would not have experienced a restraint tantamount to an arrest. Indeed, after the interview was concluded, defendant was not handcuffed, was not immediately advised he was under arrest, and instead he was taken to Starbucks for food.[19]

### 7. Conclusion

In sum, looking at the interplay and combined effect of the totality of the circumstances, we conclude that, on balance, those circumstances did not create a coercive atmosphere such that a reasonable person in defendant's position would have experienced a restraint on his freedom of movement to the degree normally associated

---

[19] We reject defendant's assertion in his briefing that the detectives "maintained custody of defendant" after the interview. There was no evidence presented at the *Miranda* hearing indicating they exerted any physical restraint on defendant after the interview at the Sheriff's facility.

28

with a formal arrest.  (*Bejasa, supra,* 205 Cal.App.4th at p. 35; *Aguilera*, *supra*, 51 Cal.App.4th at pp. 1161, 1162.)  Defendant's contention thus fails.[20]

## DISPOSITION

The judgment is affirmed.

/s/
MURRAY, J.*

We concur:

/s/
HULL, Acting P. J.

/s/
RENNER, J.

---

[20] Having concluded the interrogation resulting in defendant's confession was noncustodial, we need not address defendant's second contention that his post-*Miranda* statements made after they left the Sheriff's facility must be suppressed based on the prior failure to provide a *Miranda* warning before the earlier statements were made.

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.